**Donald L. KELLY and Gross Common Carriers, Inc., a corporation, Appellants,**

**v.**

**W. R. CORDLE, as Trustee to Prosecute an Action for the Wrongful Death of Harry R. Cordle, Harlan T. Pritchard and Twin Cities-Winona Motor Express, Inc., a corporation, Appellees.**

**No. 15056.**

United States Court of Appeals Eighth Circuit.

Dec. 23, 1954.

Paul C. Thomas, St. Paul, Minn. (Mordaunt & Mordaunt, Minneapolis, Minn.,

on the brief), for appellants.

Lawrence M. Engelhard, La Crosse, Wis. (Engelhard, Snodgrass & Goerdt, La Crosse, Wis., on the brief), for appellees Harlan T. Pritchard and Twin Cities-Winona Motor Express, Inc.

F. H. Durham, Minneapolis, Minn. (A. M. Lystad, Minneapolis, Minn., on the brief), for appellee W. R. Cordle, as trustee to prosecute an action for wrongful death of Harry R. Cordle.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

This appeal is from a judgment on jury verdict for $17,500 for the death of Harry R. Cordle, found to have been caused by the negligence of the defendants (appellants) Gross Common Cariers, Inc., and its employee Donald L. Kelly, who was in charge of its trailer-truck which inflicted the fatal injury. The judgment also dismissed with costs the action against the co-defendants (appellees herein) Harlan T. Pritchard and his employer Twin Cities-Winona Motor Express, Inc., a corporation, pursuant to the verdict of the jury in their favor. The two points urged for reversal by the Carrier company and Kelly are (1) that the verdict is not supported by the evidence and (2) that the court erred in the exclusion of evidence.

(1) At the conclusion of all the evidence the defendants who are the appellants here moved for directed verdict on the grounds (a) that "there has been a total failure of proof that these defendants were guilty of actionable negligence" and (b) that the deceased was guilty of contributory negligence as a matter of law. The motion was argued at length and was denied. After verdict the trial court again considered the challenge to "the weight and sufficiency of the evidence" on the motion made by the Carrier company and Kelly for judgment notwithstanding the verdict or for new trial. On such reconsideration the court summarized the pertinent facts and commented as follows:

"Kelly, during the course of his employment by Gross as a driver of a tractor-trailer combination truck, arrived at about noon on September 17, 1951, at the loading platform of J. R. Watkins Company, on Chestnut Street, in the City of Winona. Arriving thereat, he found decedent's tractor-trailer combination backed up to and flush with one of two doors furnished for loading. Kelly thereupon maneuvered his truck so as to park parallel with decedent's truck and backed to within 18 inches of the only remaining door so as to leave a means of ingress and egress. to and from the Watkins building. Kelly entered the building, as customary, by climbing up in the space thus left between the truck and the building. It is undisputed that the trailer in question weighed 9500 pounds and that the attached tractor weighed 7500 pounds. There was a slight dip of the crown of the street. where the tractor was parked, and the crown of the street was 8¾ inches lower than the driveway at. the building line, adjacent to which the trailer was parked by Kelly.

"Pritchard next arrived, driving a similar tractor-trailer combination. as an employee of Motor Express. Finding the only available doors for loading occupied, he parked his tractor-trailer on Chestnut Street and parallel with the Watkins building. That the Cordle, Gross and Motor Express trucks were parked as above set forth is undisputed.

"Kelly and Gross contend that the braking mechanism of the Gross truck was in good condition. Kelly testified that before leaving his truck he applied the vacuum brakes and the emergency brake, and that he also left the engine in reverse gear after turning off the ignition. This is uncontradicted. That there was. sufficient space between the Gross. truck and the building to permit. Pritchard to enter as Kelly did is undisputed. That Pritchard had to.

wait for Cordle or Kelly to vacate before he could back his truck to the loading platform is not denied. Upon entering, Pritchard learned Cordle was leaving, and he followed him out of the building to the only means of egress and at which point Cordle met with mortal injuries."

For greater accuracy the court then quoted excerpts from the transcript of the testimony given by Pritchard (the only eyewitness to the accident) as follows:

"Q. And on September 17, 1951, you were employed by the Twin Cities-Winona Motor Express? A. Yes.

"Q. And on that day you had one of their trucks at the Watkins loading platform on Chestnut Street? A. Yes.

"Q. What time did you get there with your truck? A. Shortly before one.

"Q. And where did you park your truck? A. On Chestnut Street side facing north.

"Q. You parked it out on the street? A. Yes.

"Q. Because, as I understand the testimony, the north door was blocked by the Cordle truck and what we call the south door was blocked by the Gross truck? A. Yes.

"Q. You parked your truck somewhere on Chestnut Street? A. Yes.

"Q. In the street proper? A. Yes.

"Q. And then did you get out of the truck? A. Yes.

"Q. And enter the Watkins Building? A. Yes.

"Q. And how did you get in? A. In behind the Gross Truck.

"Q. And I understand it's customary for you truck drivers to enter and leave behind a truck that has that space like the Gross truck? A. Yes.

\* \* \* \* \* \*

"Q. Who left the building first? A. Cordle.

"Q. And just tell us what happened to Cordle. A. Well, he left the building by getting down, you know, in the rear of the truck.

"Q. Which truck? A. The Gross Common Carrier.

"Q. He left it first, and were you behind him? A. Yes.

"Q. Right behind him? A. Yes.

"Q. Now, as Cordle left this Watkins Warehouse you followed him, you say? A. Yes.

"Q. How far back were you from him—how far away were you from him? A. Just walking distance.

"Q. Well, how many feet back of him were you? A. Oh, four or five, similar to that.

"Q. And he was directly in front of you, is that right? A. Yes.

"Q. And then you saw him— what did he do, jump down between those—between the building and the trailer there? A. Well, he just got down.

"Q. How did he do it? How did he get down? A. I think he put the palm of his hand on the back of the unit because the unit was close to the door. It must have been closer than when the man went in because he had to go out sideways.

"Q. Well, in other words then, you saw him put his hand on the rear of the trailer and then he jumped down, did he, in between? A. Well, then, the other hand was at the loading door, you know, it tapers down a bit.

"Q. Well, in other words, he got down sideways, is that right? A. Got down sideways.

\* \* \* \* \* \*

"The Court: As he left the building you saw the truck move back, is that it? A. Yes.

"Q. And as a result of the moving back, Mr. Cordle was pinned

against the building, is that correct?

"Mr. Mordaunt: I object to that upon the grounds it's leading.

"The Court: It is leading, but it is in the case already. Overruled.

"Q. Is that correct? A. Yes.

\* \* \* \* \* \*

"Q. What if anything did Mr. Cordle do after he was pinned by the Gross truck? A. Yelled for help.

"Q. Can you say what he yelled? A. 'Help, get his truck off of me.'

\* \* \* \* \* \*

"Q. Did you have any difficulty in getting out between the Gross truck and the door? A. Yes.

\* \* \* \* \* \*

"Q. Now then, will you tell the Court and the jury what you did immediately after you got out? A. Immediately after I got out I run around the front of the truck, got in the truck, found that the truck was in gear and the brakes were set, and I started the truck as fast as I could and put it into forwarding gear and drove it off the man.

\* \* \* \* \* \*

"Q. Will you just go step by step as to what you did inside the tractor in order to get this unit off of Mr. Cordle. A. Well, knowing the truck was in gear, I held my foot on the brake, crossed my feet because the starter is on the opposite side, turned the switch on, but still holding my foot on the brake so the unit couldn't release back any further, got the truck started, then got into a forwarding gear. Then I had my hand on the emergency at all times so when I had the motor speed up a little higher speed I released the emergency at the same time I went forward.

"Q. Would you have any opinion, Mr. Pritchard, as to how long that particular transaction took? A. Oh, just a matter of moments.

"Q. And where did you move the truck? A. I moved it straight ahead.

"Q. And can you tell the court and jury whether there was any slippage when you released the truck mechanisms? A. Well, there is a slight slippage in changing gears.

"Q. What do you mean by slippage? A. Well, in changing gears, by the time you let the clutch out of it would release a trifle.

"Q. And which way would the truck go? A. It would release back.

"Q. Have you any opinion as to how far that slippage was in terms of releasing? A. No.

"Q. But there was some slippage? A. Yes.

"Q. What, if anything, did you do after you moved the unit away from Mr. Cordle? A. After I moved the unit I was going back to see what happened, but by that time Kelly had already taken care of the injured man, so, in turn, my truck and with the Gross Truck, was blocking the street. So therefore I had to move my unit to make room for the ambulance.

\* \* \* \* \* \*

"Q. Now, isn't it a fact, Pritchard, that the first thing that you heard Cordle holler help was when he jumped down in there, is that right? A. Yes.

"Q. That's when you heard that? A. Yes.

"Q. And the fact is, Mr. Pritchard, that you never did see that trailer move backward, isn't that right? You didn't see it move back, you saw him jump down and holler, wasn't that right? A. Yes.

\* \* \* \* \* \*

"Q. Did you see the Gross Common Carrier tractor—trailer, rather, move at the time when Mr. Cordle

jumped down into the area from the rear to the building? A. Yes.

\* \* \* \* \* \*

"Q. You definitely saw the truck move back? A. Yes.

"Q. I believe you also testified it pinched Mr. Cordle between the truck and the building? A. Yes.

"Q. And then he hollered for help? A. Yes.

\* \* \* \* \* \*

"Q. Now, you want to tell us you not only saw the truck back, but you saw him walk towards his left, is that right? A. I said started to move.

"The foregoing is substantially all the evidence directed at the cause of death. [Admittedly Cordle died from his injuries within a few hours after the accident].

\* \* \* \* \* \*

"The record of the instant case is not one where the proved facts give equal support to each of two inconsistent inferences. If Pritchard is to be believed, he actually saw the Gross truck move back simultaneously with Cordle's jumping down between the truck and the building and prior to Pritchard's engaging in the act of rescue as above outlined. With good brakes properly applied, the truck should not have moved. \* \* \* Kelly left space for ingress and egress. Pritchard and he entered the building with the aid of said space. Decedent's physique did not differ from that of Kelly or Pritchard in weight or build so as to make it impossible for him to follow the custom and practice in leaving the building via said space. This is mentioned for the reason that movants contend decedent became wedged therein when he 'jumped down', as opposed to Pritchard's testimony that he saw the truck move back against decedent and pin him to the wall. Before Kelly came out of the building

Pritchard had moved the truck. Hence we have no eye witness as to what Pritchard saw and did other than Pritchard, who admits that when he moved the truck forward and away from decedent, there was a slight slippage backwards before the forward movement. As the Court views the record, the jury could find in favor of or against all of the defendants. Instead, they found against Kelly and Gross and absolved Pritchard and Motor Express. A verdict against Pritchard and Motor Express and in favor of Kelly and Gross would find support in the evidence. But in choosing the parties liable, once plaintiff has made out a case, that choice is peculiarly within the province of the trier of the facts of the instant case. In this respect the trial court cannot substitute itself for the jury, despite the court's difficulty in trying to allocate blame and to distinguish between the four defendants in determining cause and responsibility for the death of Cordle. \* \* \*

"If decedent's negligence contributed to the accident, there can be no recovery by plaintiff. This was also a question for the jury and was resolved in favor of plaintiff by the verdict. The verdict for plaintiff is aided by the presumption that 'a dead man exercised due care for his own safety.' (Citing cases). If the court were making the finding of fact, the result may have been otherwise than that arrived at by the jury."

On our own review of the evidence we find ourselves in accord with the conclusion of the trial court that the testimony of Pritchard constituted substantial evidence that the Carrier company's truck did back up against Cordle and injure him while he was between the truck and the loading platform. We also agree that he was not guilty of contributory negligence as a matter of law in going between the end of the trailer

and the loading platform as the other men had done. The space he used was left there by Kelly for that purpose. The use would have been harmless if the truck had not moved.

On appeal the appellants stress contentions presented to the trial court but not discussed specifically by it in its memorandum to the effect that the highest point where the tractor-trailer unit was standing was at the wall of the Watkins building; that the center of the street where the front of the tractor stood was 8¾ inches lower than the ground at said wall; that tests made after the accident showed that when the unit was parked without brakes it would roll away from the building; also there was an opinion given by a qualified expert that when the unit was standing at the place of the accident with the emergency brake set and the unit in reverse gear it would not move without power being applied. In other words it is claimed that Pritchard's testimony is disproved by the physical facts.

The evidence was that the overall length of the tractor-trailer was 36 feet and the weight was 17,000 pounds. The tractor weighted 7500 pounds and the trailer 9500 pounds, but a large part of the weight of the trailer rested upon the tractor so that when the unit was joined up the weight was mostly on the tractor wheels. The jury had before it a profile chart drawn to scale by a qualified engineer, showing the elevations of the ground from the Watkins loading dock across a railroad track that ran parallel to and about five feet away from the building, then across a concrete ramp onto the street on which the loading dock faces, then across the street to an alley. It also had photographs of the same terrain well out into the street.

The chart showed that although the center of the street to which the front of the tractor unit was adjacent when Kelly parked it, was lower than the ground at the loading dock, all of the tractor wheels were standing upon a substantial incline *towards* the building. The wheels at the rear end of the trailer were very close to a rail of the railroad track, possibly upon it, and stood on practically level ground. It was not impossible that the weight on the tractor wheels which were on the downward incline towards the loading dock was sufficient to move the lighter weight on the rear part of the unit which stood on the level towards the building when the air-brake had leaked out and ceased to work.

Although the engineer's profile chart showed the elevations on the ground where the truck was parked in perfectly smooth lines, the photographs showed that there was unevenness from planking across and at the sides of the railroad track and from usage by the trucks around the loading docks. It was undisputed that the air in the compression brake would leak out and that brake would cease to hold within the time that the tractor truck was left standing by Kelly.

There was also some little play in the connecting parts of the long tractor-trailer unit. As stated by the automobile expert shop foreman, who had been in auto repair work for 25 years, "There has to be a play in all of these parts or you would get a growl in the whole car while driving."

We find no error in the conclusion of the trial court that "This is not a case where the physical facts contradict the testimony of any of the witnesses."

We hold that the verdict is supported by substantial evidence.

(2) As to exclusion of evidence.

The witness Malszycki was an employee of Watkins Company called by the appellants herein. He was inside the Watkins building and heard the deceased yell. He ran with Kelly to the scene of the accident and his testimony, which the court admitted in evidence, was that he heard the deceased say, "that truck bumped against me." He also appears to have volunteered that "He [Cordle]

thought there was somebody in the truck but there was nobody in the truck", which the court struck out. Thereafter counsel for those who are appellants here propounded the question to him, "And you say that you heard Cordle (the deceased) say that some one backed the truck into him?" The witness answered before any objection was made and then counsel for Pritchard and his employer said, "I am objecting to that as being conversation with a deceased person." The record shows the court then said, "Sustained."

But the answer which the witness gave to the question was not stricken and no motion was made to strike it. The answer to the question, "And you say you heard Cordle say that some one backed the truck into him?" was "That's what he says." It remained in the record and counsel for the appellants here quoted it and commented on it in argument to the jury. Counsel for plaintiff made no objection in respect to either the question or the answer or the argument made on it to the jury. The trial court held on full consideration that there was no prejudice to Kelly or Gross Common Carriers, Inc., under the circumstances.

In Nubbe v. Hardy Continental Hotel System, 225 Minn. 496, 31 N.W.2d 332, 333, the Supreme Court of Minnesota said:

> "A party is not prejudiced by the erroneous sustaining of an objection to a question if the witness answers the question and such answer is not stricken from the record or otherwise withdrawn from the jury's consideration."

We find no error in the trial court's conclusion that the appellants suffered no prejudice from the ruling of the court in respect to the evidence of Malszycki complained of.

The judgment is affirmed.